IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAHTIYAR MAHNUT, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-1704 (JR) |
| ) | |
| GEORGE W. BUSH, ) | |
| *et al.*, ) | |
| Respondents. ) | |

## DECLARATION OF JOSEPH S. IMBURGIA

Pursuant to 28 U.S.C. § 1746, I, Major Joseph S. Imburgia, Judge Advocate General's Corps, United States Air Force, hereby state that to the best of my knowledge, information and belief, the following is true, accurate and correct:

1. I am the Assistant Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2. I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Bahtiyar Mahnut that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or are redacted. An OARDEC staff member has redacted information that would personally identify other detainees and certain U.S. Government personnel and foreign nationals in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 20 Sep 05

Joseph S. Imburgia
MAJ, JAGC, USAF



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 832

~~FOR OFFICIAL USE ONLY~~

29 JAN 2005

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #277 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

UNCLASSIFIED

19 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To: Director, Combatant Status Review Tribunal
Via: Legal Advisor

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN #277

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal #12 of 29 Sep 2004
(2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I find that:

   a. The detainee was properly notified of the Tribunal process and elected to participate by attending the CSRT, providing a sworn statement, and by responding to questions posed by his personal representative and the CSRT. *See* Enclosure (3) to Encl. (2).

   b. The Tribunal was properly convened and constituted by enclosure (1).

   c. The Tribunal substantially complied with all provisions of references (a) and (b).

   d. Note that some information in Exhibits R-4 through R-6 was redacted. The FBI properly certified in exhibit R-2 that the redacted information would not support a determination that the detainee is not an enemy combatant.

   e. The detainee did not request that any documentary evidence be produced. However, the detainee did request that 17 witnesses-detainees, all of ▮▮▮ heritage (captured with detainee), be produced to testify on detainee's behalf. The CSRT determined that "all of the witnesses would probably testify similarly, if not identically," and therefore advised the detainee that he could chose two from the 17 to testify on his behalf. The detainee chose ISN ▮▮▮ and ISN ▮▮▮ to testify on his behalf, and the CSRT approved the request. Each of these two witnesses-detainees testified at the CSRT. The CSRT's determination to allow these two witnesses to testify was proper.

   However, there is no documentation in Encl. (2) which indicates the basis of the Tribunal's determination that the requests for the 15 remaining witnesses would be

UNCLASSIFIED

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277

"similar[], if not identical," as noted in the Unclassified Summary Basis of Decision. *See* Enclosure (1) to Encl. (2).

Notwithstanding, references (a) and (b) clearly provide that the Tribunal has the discretion to determine what evidence it deems relevant, that it is "not bound by the rules of evidence such as would apply in a court of law," and that it "may consider any information it deems relevant and helpful to a resolution of the issues before it." As a corollary, the converse must be true that the Tribunal may refuse to consider any evidence it does not deem "relevant and helpful" to their determination.

Here, a review of the Record reveals that, although there is no documentation in Encl. (2) of the detainee's request for any of the witnesses, the Tribunal was presented with a proffer of the witnesses' testimony at some point during the proceedings which enabled it to reach its determination that these 17 witnesses' testimony would be "similar, if not identical," because the CSRT references "data" in reaching its determination. *See* Enclosure (1) to Encl. (2). Thus, it appears from a clear review of the record that, even if the remaining requested witnesses had been called, the CSRT would have reached the same determination, that the detainee was an enemy combatant, because the preponderance of evidence supports the determination reached by the CSRT. Therefore, the Tribunal's denial of detainee's request for these 15 additional witnesses did not appear to prejudice the detainee.

f. The Tribunal's decision that detainee #277 is properly classified as an enemy combatant was unanimous. However, the Tribunal "urges favorable consideration for release of the Detainee," and "urges that he not be forcibly returned to the People's Republic of China."

g. The detainee's Personal Representative was given the opportunity to review the record of proceedings, and submitted post-tribunal comments to the Tribunal which objected to the Tribunal's denial of detainee's request to produce all 17 witnesses, and which objected to the Tribunal's refusal to allow one of the witnesses to make an unsolicited statement to the Tribunal after the CSRT and personal representative had questioned the detainee. The personal representative specifically alleged that the CSRT's rulings were a denial of the detainee's due process rights.

In reviewing the objections, the CSRT first noted that the Tribunal would have been burdened with "repetitive, cumulative testimony" if it had permitted each of the 17 witnesses to testify. As discussed above, the CSRT's determination complied with references (a) and (b), and was therefore, proper, and did not appear to prejudice the detainee.

Similarly, the CSRT properly refused to allow an unsolicited statement of one of the witness-detainees. As the CSRT noted in its review of this objection, the Tribunal President "has never permitted witnesses to make spontaneous statement that are not in

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277

response to questions" posed by the CSRT or the personal representative. However, the Tribunal noted that the personal representative "could have easily elicited the additional information from the witness by asking more questions" of the witness, "but elected not to do so." Therefore, the ruling was proper, and did not prejudice the detainee.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR



# Department of Defense
### Director, Combatant Status Review Tribunals

29 Sep 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

MEMBERS:

████████████ Colonel, U.S. Marine Corps Reserve; President

████████████ Lieutenant Colonel, JAGC, U.S. Army; Member (JAG)

████████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

23 December 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander ICO ISN 277

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███.

FOR

CHARLES E. JAMISON
CAPT, USN

~~SECRET//NOFORN//X1~~

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: __#12__

(U) ISN#: __277__

Ref: (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
     (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
     (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl: (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
     (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
     (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
     (4) (U) Copies of Documentary Evidence Presented (S/NF)
     (5) (U) Personal Representative's Record Review (U/FOUO)

1. (U) This Tribunal was initially convened on 23 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 27 October 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #277 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is affiliated with forces associated with al Qaida and the Taliban, which are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

[signature redacted]

Colonel, U.S. Marine Corps
Tribunal President

DERV FM: Multiple Sources
DECLASS: XI

~~SECRET//NOFORN//X1~~

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

(Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____
ISN #: _____277_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is affiliated with forces apparently associated with al Qaida and the Taliban that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee was in a [redacted] training camp in Tora Bora from June 2001 to November 2001 (where he was trained on the Kalashnikov rifle and on tactics) and left after the United States air campaign began against the Taliban. He is alleged to be a member of the East Turkistan Islamic Movement (ETIM), which is assessed to be an extremist movement, linked to Al Qaida. The Detainee was arrested with Arabs at a Pakistani mosque. The Detainee chose to participate in the Tribunal process. He initially requested seventeen witnesses then modified his request to two witnesses after the Personal Representative's discussion with the Tribunal President. He requested no unclassified or classified documents be produced, and made a sworn verbal statement. The Tribunal President found the two requested witnesses reasonably available. The Detainee, in his verbal statement, admitted training at a [redacted] training camp in Afghanistan but denied being a member of either Al Qaida or ETIM.

The Tribunal President's evidentiary and witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a, and R-1 through R-19.

UNCLASSIFIED//~~FOUO~~

ISN #277
Enclosure (1)
Page 1 of 4

UNCLASSIFIED//FOUO

    b. Testimony of the following persons: ▓▓▓▓ and ▓▓▓▓ ▓▓▓▓ (fellow detainees of the Detainee; their internment serial numbers are included at Enclosure (2)).

    c. Sworn statement of the Detainee.

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
|---|---|---|
| ▓▓▓▓ | Reasonably Available | Yes* |
| ▓▓▓▓ | Reasonably Available | Yes* |

\* The Personal Representative, on behalf of the Detainee, originally requested all 17 witnesses of ▓▓▓▓ heritage currently detained at Camp Delta be made available to testify. After determining from the data that all the witnesses would probably testify similarly, if not identically, the Tribunal President responded that he would allow two witnesses of the 17 originally requested, and the Detainee could choose whichever two he believed would best help his case. The Detainee chose the above-mentioned witnesses to testify and they did so.

The Detainee requested no additional evidence be produced.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

    b. The Recorder also introduced, as Exhibit R-3, an excerpt of the Terrorist Organization Reference Guide from the U.S. Department of Homeland Security, January 2004. Although this was helpful in providing information concerning the Eastern Turkish Islamic Movement (ETIM), especially concerning the alleged tie between ETIM members and a plot to attack the U.S. Embassy in Kyrgyzstan and other U.S. interests abroad, the Tribunal found it to be only moderately persuasive because it did not indicate that this specific Detainee had any knowledge or responsibility for any anti-U.S. acts.

UNCLASSIFIED//FOUO

    c. Essentially the only other unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony and the sworn testimony of two witnesses that the Detainee requested to testify on his behalf. A summarized transcript of the Detainee's and witnesses sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee testified that he did train at the ███ camp in Afghanistan but he did not belong to the ETIM or Al Qaida and he was not aware of any assistance that the Al Qaida might be giving to ETIM or any other Uighur group. The witnesses both testified that they had seen the Detainee in the ███ training camp in Afghanistan and trained with him there.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

### 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

    a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

    b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

    c. The Detainee is properly classified as an enemy combatant because he is affiliated with forces apparently associated with al Qaida and the Taliban, which are engaged in hostilities against the United States or its coalition partners.

    d. The Tribunal President reviewed the Personal Representative's comments at Enclosure (5) to the CSRT Decision Report. Noting that the Personal Representative disputed his ruling to allow two witnesses instead of the 17 requested witnesses, the Tribunal President reaffirmed his ruling that permitting the Detainee to bring two witnesses on his behalf was a proper balance between allowing the Detainee to introduce favorable evidence on his behalf and not burdening the Tribunal with repetitive, cumulative testimony about the Detainee. Next, the Tribunal President disputes having denied the Detainee adequate due process in his hearing. The Detainee and Personal Representative could have, and apparently did, ask as many questions of the witness as they desired. It is true that the Tribunal President denied the witness's request to make a spontaneous statement because it was not in response to a question from any of the

participants (see page 15, Enclosure (3)). The Tribunal President has never permitted witnesses to make spontaneous statements that are not in response to questions and so the decision to act similarly here was consistent with past rulings on this topic. Furthermore, the Detainee or the Personal Representative could easily have elicited the additional information from the witness by asking more questions of him, but they, for whatever reason, evidently chose not to do so. The witness had sufficient opportunity to testify and the Detainee had adequate opportunity to present his case before the Tribunal.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

███████████

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

### Summarized Sworn Detainee Statement

*The Personal Representative made the following statement on behalf of the Detainee.*

Before addressing points on the Unclassified Summary, I want to state for the record that historically the Chinese have executed Uighurs who have been deported and returned to China. I do not want repatriation and am seeking political asylum because I fear execution upon return to China.

Part of the enemy combatant definition is whether someone fought against the United States or the coalition forces, and exhibit D-b is a list of coalition partners and China is not on that list.

- **3      Detainee is a member of Al Qaeda.**

    I never heard of Al Qaeda until arriving in Cuba and I have no ties to Al Qaeda.

- **3.1    Detainee was in a ▮▮▮▮ training camp in Tora Bora from June 2001 to November 2001, and left the camp after the United States air campaign began.**

    The bombing did start while I was in the camp and we did flee for our lives. I do not know who was running or funding the camp, but the people who trained me were Uighur and I was not aware of any ties to the Taliban or Al Qaeda.

    My battle is against the Chinese, not the United States or the coalition partners. The other Uighurs and I prefer to settle in Europe, Canada or the United States. To our knowledge there was no fighting with the Chinese in Afghanistan, and it was therefore a safe place to train so we could one day fight the Chinese.

    The person running the camp was named  ▮▮▮▮ and he was a ▮▮▮▮.

- **3.2    Detainee was trained on the Kalashnikov rifle and tactics.**

    I trained on the AK-47 and physical fitness activities.

- **3.3    Detainee is a member of the Eastern Turkistan Islamic Movement (ETIM).**

    I suspect that this is an organization that fights the Chinese but I don't know any organization by that exact name.

ISN# 277
Enclosure (3)
Page 1 of 18

UNCLASSIFIED//~~FOUO~~

- **3.4    The Eastern Turkistan Islamic Movement is an Islamic extremist movement linked to Al Qaeda.**

    I had never heard of Al Qaeda, and therefore am not aware of any links between any Uighur freedom organizations and Al Qaeda. The Uighurs simply want freedom from China as our ultimate goal, just like the United States people have fought for freedom throughout their history.

- **3.5    Detainee was arrested with Arabs as a Pakistan mosque.**

    It's true I was arrested in a mosque and I got to the mosque by following Arabs who were also fleeing for their lives. I don't know much about the Arabs because I wasn't able to communicate with them; they spoke a different language.

We spoke of the Terrorist Organization Reference Guide, and this says there was a link between the Eastern Turkish (sic) Islamic Movement and Al Qaeda, and specifically the document thought there were links between the extremist movement and attacks on U.S. Embassies overseas. I reiterate that I'm not familiar with the Eastern Turkistan Movement and I have no knowledge by any Uighur group against embassies of the United States. What I know of the Uighur groups, the only goal is to get freedom from China and they are pro-U.S.

We discussed the relationship of the camp and it was a 3-hour drive from Jalalabad on a dirt road.

*The Detainee made the following sworn statement.*

The United States accused me of being a member of Al Qaeda, but in my life in Afghanistan, I had never heard of Al Qaeda, and when I came here, they started interrogating me and asked me if I knew about Al Qaeda. That's how I heard of Al Qaeda.

If you ask me questions one by one, I will answer everything.

**<u>Tribunal Members' Questions to Detainee</u>**

Q:    Are you originally from the Uighur province of China?

A:    Yes.

Q:    So, you are considered a Chinese citizen?

A:    Yes.

UNCLASSIFIED//FOUO

Q: If you were allowed to choose to live anywhere you wanted, where would you choose to live?

A: My best option, my choice would be to go back to live in my country if it was free, but until my country is free I'd like to live in some kind of democratic country, somewhere in Europe, it doesn't matter. Any country.

Q: How long were you in Afghanistan?

A: I went to Afghanistan approximately on June 20, 2001. One night, we were doing construction work, building a house and after we went to sleep, the bombs started. We then fled and ran for our lives.

Q: Was this in the camp with the other ▮▮▮ fighters?

A: Yes, it's the place all the ▮▮▮ stayed.

Q: How many other ▮▮▮?

A: Approximately 30-35 people.

Q: You said it was lead by a ▮▮▮

A: Yes.

Q: How did you know how to go there from your home country?

A: My goal wasn't to go to Afghanistan. When I was in my country, the Chinese government tortured our people. We suffered much and I can't take it. I don't want to see it anymore, that's why I want to go somewhere I can live a free life. That's why I left my country.

When I left my country, I went to Kazakhstan, then to Pakistan. When I reached Pakistan, I had $700 U.S. dollars and when I talked to other people in Pakistan, I was told I couldn't make it through the country with $700 and I wanted to go. I was told there was a place I could go.

I was in Pakistan and tried to do business, but it didn't work out because Pakistan is a poor country and very bad for business. If you had $700 U.S. dollars in my home country, you'd be a rich person, but I couldn't do any business there. People gave me advice and said there was a group of people in Afghanistan, and I could go there because their group's goal was just to fight against the Chinese government and if I went I didn't have to pay for food or anything, so I went to Afghanistan.

ISN# 277
Enclosure (3)
Page 3 of 18

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

        They told me to go and stay, and as soon as they get more money, they'll get me and take me to whatever country I wanted to go to, like Canada or America.

Q:    Did you go by yourself? With a group of other people? With your family?

A:    There were two people when I left my home country. We went to Pakistan and Afghanistan together.

Q:    So, the other [REDACTED] that were at the camp, you met them there?

A:    Yes.

Q:    You said you didn't know the name of this group by its exact name, the Eastern Turkistan Islamic Movement. Do you belong to a group with a similar name?

A:    Our fight is for freedom and our independence, but we don't talk about the Islamic Movement. I don't know where the Islamic Movement came from. The freedom fights and the independent fights have not been called [during] the last decade, they've been called for the past few centuries.

Q:    Are all the people in the group Muslim?

A:    Yes.

Q:    Are people who are not Muslim accepted into the group?

A:    The U.S. is the most powerful country in the world and China is the second most powerful; it is growing very fast. We are fighting against the government and we need help from any nation that will help us. We need their help to fight.

Q:    How many [REDACTED] are there today that are involved in this?

A:    I saw about 35 people with my own eyes at that place [the camp].

Q:    Probably more than that have the same goals you do?

A:    There are lots of Uighurs. They left the country because of the Chinese government. All of the Uighurs have the same goal of taking back our own country.

Q:    Do you know how many Uighurs are still in your home country?

A:    From what I read in books, there are up to 30 million Uighurs and if you don't count those abroad, there are probably 26 or 28 million people at home.

**Tribunal Members Questions to Personal Representative**

Q:   You mentioned the name ▬▬▬. Can you explain his significance again, please?

A:   He was the ▬▬▬ who was running the camp.

**Tribunal Members Questions to Detainee**

Q:   When you were at the camp, did you see any people training there besides you and your fellow ▬▬▬

A:   When I came to the camp, I only saw ▬▬▬ people.

Q:   Was there ever a time when the Taliban soldiers asked you and your group to help them in their fight?

A:   No.

Q:   Before the United States attacked the camp, had anyone else, like the Northern Alliance, attacked your camp before that?

A:   No. In the camp there was no fighting, there was just peace and quiet.

Q:   So, as soon as that attack happened, that is when you and your group tried to escape to Pakistan?

A:   When the bombing started, one of our people was dead. We said they came here to try to fight, if we stay here we're going to lose all of our people. We were scared and ran to the mountain and looked for the road to go somewhere else. We couldn't find the road, so we stayed there a little while.

Q:   Did you have a passport, money and weapons with you for protection when you were making your journey?

A:   The first day I came to the camp, ▬▬▬ told me that I had to give him my passport and whenever I wanted to leave I could ask for it back. He then took my passport from me.

Our clothing and baggage was inside the house at the time. We left everything in the house when we left.

Q:   You didn't have time to go back and get anything?

UNCLASSIFIED//~~FOUO~~

A: We couldn't take our clothing with us.

Q: So, it's not as though he ▮ wouldn't let you have it back, it's that you didn't go back to get it because you were afraid you might get killed?

A: When they dropped the bombs, the place caught on fire and everybody was running in different directions. Nobody asked what are you doing, let's go, everyone was just running scared. If you stay there, you will get burnt.

Q: So, no passport and no money, did you at least take weapons for protection?

A: No, I didn't have a weapon.

Q: So, you went from Tora Bora all the way to the Pakistan border and you were able to enter Pakistan?

A: We stayed behind the mountain for a while because we couldn't find a road. One day we saw some Arabs and asked them, they said "Pakistan" so we followed them.

There is a funny story; at that time, even the local monkeys chased us to get out. We really wanted to get out of that place. If you want to hear it, I would like to tell.

Q: It says here that you were arrested in a mosque in Pakistan, and I'm wondering how you made it in without a passport.

A: There were no immigration people or border people. We just passed through the mountains. They had nothing there.

Q: So, they captured you and put you in a jail in Pakistan for a while?

A: We entered the village, and we were fed. Then in the middle of the night, around midnight we were told to get up. We got up and we went to the mosque. During this time, I didn't realize I was being captured. When they took me to the prison and put shackles on my hand, I realized I had been captured.

Q: So, they left you in the jail for a while and then turned you over to Americans?

A: Yes.

Q: How many of the other ▮ were with you when you were captured?

A: There were 18.

ISN# 277
Enclosure (3)
Page 6 of 18

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Q: All of you were in the same place at the same time?

A: All 18 of us left camp together, but we were not in the same cell in the Pakistan prison.

Q: But in the mosque, yes?

A: Yes.

Q: I don't suppose any representatives from your home country tried to help you?

A: The Chinese Delegation came to this island.

Q: They didn't come to Pakistan?

A: No, not to Pakistan.

Q: But you said they came to this island and talked with you?

A: Yes. When we were captured in Pakistan, we didn't tell them we were from China. If we told them we were from China, Pakistani tradition will send us back to China. We were scared of that, so we told them we were Afghani.

Q: Of the 30-35 [redacted] in the camp, are any of them veterans of fighting in Afghanistan?

A: There are no veterans from the training camp; all of them are my age.

Q: But they were there before you were there?

A: When I got to the camp, there were 20-25 people there ahead of me.

Q: Do you have any idea how long they were there?

A: I didn't ask how long they'd been there.

Q: So, you were together about 3 or 4 months before the bombing started?

A: Yes. The time I spent with them started approximately in July, about 3 months.

Q: You were all [redacted] there, and you must have talked about what you wanted to do and how you wanted to free your country. There was no discussion about what was happening in Afghanistan, the Taliban and the Northern Alliance?

ISN# 277
Enclosure (3)
Page 7 of 18

UNCLASSIFIED//~~FOUO~~