IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
SADAR DOE, et al.,             )
                               )
            Petitioners        )
                               )        Civil Action No. 05-CV-1704 (JR)
v.                             )
                               )
GEORGE W. BUSH, et al.,        )
                               )
            Respondents.       )
_____)
```

**MEMORANDUM IN SUPPORT OF MOTION FOR ORDER
REQUIRING ACCESS TO CLIENTS
<u>AND ACCESS TO ALL RECORDS OF CSRT AND  ARB PROCEEDINGS</u>**

**INTRODUCTION**

Sadar Doe and Arkeen Doe ("Petitioners") are two Chinese Uighur detainees – brothers –

held by the United States Government at Guantanamo Bay Naval Station ("Guantanamo Bay").[1] In

response to the Court's August 31, 2005 Order directing respondents to "make a return certifying the

true cause of petitioner's detention," the Government has produced to counsel the unclassified

portion of  Petitioners' final records of proceedings before the Combatant Status Review Tribunal

("CSRT"). Putatively classified portions of the CSRT proceedings were filed with the Court *in*

*camera*, under seal; counsel for Petitioners has not seen the classified portions or been apprised of

the contents. *See,* Respondents' Response to Order to Show Cause and Notice of *In Camera*

Submission Under Seal dated September 21, 2005, Dkt. No. 9 ("Response and Notice"). As part of

its Response and Notice, the Government averred that both Petitioners have been determined to be

---

[1] According to the returns that the Government has filed in this action, Petitioner Sadar Doe is identified as Bahtiyar
Mahnut and Petitioner Arkeen Doe is identified as Arkina Amahmud. See Respondents' Response to Order to Show
Cause and Notice of *In Camera* Submission Under Seal dated September 21, 2005, Dkt. No. 9.

enemy combatants affiliated with forces engaged in hostilities against the United States and its coalition partners. *Id*. at 1.

However, the unclassified portions of the returns alone demonstrate that at least one of the Petitioners – and likely both – were recommended as eligible for release despite their classification as enemy combatants. The returns also document how these Petitioners, and other Uighur detainees, are trapped in the middle of a diplomatic imbroglio between the United States and China, resulting in their continued confinement in a Guantanamo prison cell, unable to communicate with the outside world.

## A.    Brief summary of argument

At the time that the Petitioners' October, 2004 CSRT proceedings were held, the State Department was already wrestling with the resettlement options available to the Uighur detainees held in Guantanamo Bay. However, the returns make it clear that these Petitioners, and their CSRT officers, as well, all believed that the detainees would be returned to China if they were determined not to be enemy combatants. Hence, the Petitioners faced a Hobson's choice: either try to prove their innocence and be sent to China for possible torture and even death, or not put on a defense, thereby saving their lives but at the cost of their liberty.

Similarly understanding this impossible choice, and voicing the belief that forced repatriation was the only alternative to further incarceration, the CSRT – in a bizarre twist – chose neither option. As a compromise, the CSRT adjudged the Petitioners to be enemy combatants, yet (according to classified information inadvertently quoted in the unclassified returns provided to counsel) it recommended that "favorable consideration for release" be given, and urged that the detainee "not be sent back to China." The returns also contain a record of one detainee's Personal

Representative's vigorous, unprecedented, objections to the Tribunal's exclusion of exculpatory evidence during the proceedings.

At a minimum, the unclassified CSRT proceedings provided to counsel do not build a case for the Government that these Petitioners should be detained a day longer. Indeed, the limited information that the Government allowed Petitioners' counsel to see raises a powerful inference that these Petitioners  were classified as enemy combatants to save them from harm, and were concurrently (or subsequently) deemed not to be a threat to the security of the United States, and thus are eligible for release.

Further delay will only compound the unjustness of this situation. Therefore, counsel moves for access to the classified materials that shed light on the CSRT and other proceedings in these cases, and seeks an Order to allow immediate access to the clients.

**B.     Statement of Facts in Support of  Motion**

1.      Uighurs are a Turkic Muslim minority group that has been, and continues to be, brutally oppressed by the communist Chinese government.  *See* U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2004 (Feb. 28, 2005), *at* http://www.state.gov/g/drl/rls/hrrpt/ 2004/41640.htm. The United States is currently incarcerating approximately 22 Uighurs at Guantanamo Bay.  Some of these men—according to press releases, 15 or more of them—have been determined by the government not to be "enemy combatants" or not to be a threat to the security of the United States.  *See, e.g.,* Editorial, WASH. POST (May 3, 2005) ("[T]he military has determined that about 15 of [the Uighurs at Guantanamo Bay] are not  'enemy combatants.'  . . . The  Pentagon has, consequently, cleared them for release.  The trouble is that the State Department has been unable to find other countries willing to take them.").  Nevertheless, Respondents continue to imprison these men. United States Ambassador at Large for War Crimes,

Pierre-Richard Prosper, stated in a recent interview that the U.S. Government has been actively

trying, with no luck, to find a country that will take *more than a dozen Uighurs* being held at

Guantanamo Bay. Source: National Public Radio, Morning Edition, August 25, 2005 "Analysis:

Chinese detainees at Guantanamo get hearing," (Transcript available)(emphasis added).  *See also*,

The Washington Post, August 24, 2005 (U.S. Government has been attempting since 2003 to find a

country that will take the Uighurs); interview with Colin Powell, Secretary of State, in Washington,

D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all

issues with respect to all detainees at Guantánamo.  The Uighurs are not going back to China, but

finding places for them is not a simple matter, but we are trying to find places for them.").

     2.     In their papers, the Government respondents state that both Petitioners have been

determined to be enemy combatants affiliated with forces engaged in hostilities against the United

States and its coalition partners. Response and Notice at 1.

     3.     The Tribunal relied on Classified and Unclassified evidence in reaching its

determinations.[2]

     4.     On information and belief, the Government has determined that the Petitioners are not

a threat to the security of the United States, and has nevertheless failed to release them from prison.

     5.     The Unclassified Summary of Basis for Tribunal Decision that issued following the

October 23, 2004 CSRT proceedings for Bahtiyar Mahnut (Sadar Doe) states:

     2.     **Synopsis of Proceedings**

The unclassified evidence presented to the Tribunal by the Recorder indicated that the
Detainee was in a [redacted] training camp in Tora Bora from June 2001 to
November 2001 (where he was trained on the Kalashnikov rifle and on tactics) and
left after the United States air campaign began against the Taliban. He is alleged to be

---

[2] All documents referenced and quoted herein are part of, and can be found in, the returns filed by counsel as part of the Response and Notice (docket 9) pursuant to the Court's Order.

a member of the East Turkistan Islamic Movement (ETIM), which is assessed to be an extremist movement, linked to Al Qaida. The Detainee was arrested with Arabs at a Pakistani mosque. The Detainee chose to participate in the Tribunal process. He initially requested seventeen witnesses then modified his request to two witnesses after the Personal Representative's discussion with the Tribunal President. He requested no unclassified or classified documents to be produced, and made a sworn verbal statement. The Tribunal President found the two requested witnesses reasonably available. The Detainee, in his verbal statement, admitted training at a [redacted] training camp in Afghanistan but denied being a member of either Al Qaida or ETIM.

6.      The transcript of the proceeding demonstrates that Bahtiyar Mahnut (Sadar Doe) had never heard of Al Qaeda until he arrived in Cuba and that he was unfamiliar with the ETIM. *See*, CSRT proceedings, Enclosure 3 (transcript), page 1.  He left China with two other people; he arrived at the camp having first gone to Pakistan, where he was told his life savings of $700 (a fortune in China) would not last him long in Pakistan. *Id.* at 3.  He was told  that he would be taken care of at the camp, where, he was told, there were other Uighurs. *Id.*   He denied having had training on a machine gun. *Id*. at 9. When the bombing began, he fled the camp, leaving his passport, clothing, and baggage behind. *Id*. at 5. He and the 17 other Uighurs who fled with him camped out for several days in the mountains of Afghanistan because they could not find a road in the rugged terrain. They slept in a cave and were bombarded with stones by the local monkeys, whose cave they apparently had usurped. *Id*. at 6 and 8.  A group of Arabs came by and pointed them the way to Pakistan. They reached a village in Pakistan where they were fed, and soon were betrayed. They were turned over to the Americans and, out of fear of being sent back to China, told the Americans that they were Afghani. *Id*. at 6 &7.

The two witnesses Bahtiyar Mahnut was allowed to call substantially corroborated this testimony, although the questions he asked were not artful. Moreover, portions of their testimony have been redacted from the transcript so as to make it difficult to understand. The Tribunal's

questions to the witnesses mainly focused on the activities at the camp, *id* at 13-18, prompting one

witness to say that "The questions you asked don't really apply to his [Detainee's] case." *Id* at 15.

7.     During the proceeding, the following exchange took place:

Q.     If you were to be set free, you would go back to your homeland, which is China, unless you were to get asylum somewhere?

A.     I was going to ask that. My Personal Representative told me that if I am innocent I'll go back to my home country. If I'm guilty and come back an enemy, I will stay. I was going to ask you about this. If I go back to China they will kill me, but if I wanted to stay here do I have to make myself guilty?

Tribunal President: It is my understanding that if we determine you are not properly classified as an enemy combatant, you will be released to your home country.

8.     On November 20, 2005, Bahtiyar Mahnut's Personal Representative ("PR") – who is,

upon information and belief, a military officer not trained as a lawyer – reviewed the record of

proceedings and filed the following comments regarding the Tribunal results:

The detainee requested 17 witnesses who were with him during the period of interest in Afghanistan. These relevant witnesses were limited to two. . . . .

It is more probable that 17 witnesses are telling the truth than 2. . . . Further there is a reasonable expectation that relevant witnesses will have information beyond what is anticipated that will elucidate the case.

During the Tribunal . . . witness [redacted] was finished answering questions. The witness stated that he had additional information for the Tribunal and asked to make a statement. The president declined saying that the only information that the Tribunal needed to know had been asked as questions.

***The above mentioned failure to view relevant testimony denied this detainee due process***. . . . (emphasis added).

9.     On information and belief, it is highly unusual for a PR to object during a CSRT

proceeding, and more unusual still for those objections to be put in writing.

10.     The Legal Sufficiency Review of Combatant Status Review Tribunal for Detainee ISN #277 [Bahtiyar Mahnut]("Legal Sufficiency Review") written by the Assistant Legal Advisor to the Director of the CSRT dated January 19, 2005 summarized, among other things, the objections made by the PR. She determined that the CSRT would have reached the same determination with or without hearing the testimony of the other 15 witnesses, and that the failure to allow an unsolicited statement by a witness was proper.

11.     In her Legal Sufficiency Review, paragraph f., the Assistant Legal Advisor attributes to the Tribunal statements that are not included in the Unclassified Materials:[3]

> f.      The Tribunal's decision that detainee #277 [Bahtiyar Mahnut] is properly classified as an enemy combatant was unanimous. However, the Tribunal ***"urges favorable consideration for release of the Detainee,"*** and ***"urges that he not be forcibly returned to the People's Republic of China."*** (emphasis added).

12.     The above-quoted language recommending release is not included in the Unclassified Summary described in Footnote 3, and must have come from other documents that were withheld from Petitioners' counsel, and possibly also withheld from the Court. The CSRT's statement "urging favorable consideration for release," on information and belief, was made to the Administrative Review Board ("ARB"), which reviews CSRT findings and can recommend release or further detention.[4]

---

[3] The CSRT Decision Report Cover Sheet that was produced by the Government refers both to an Enclosure (1)(U) Unclassified Summary for Basis for Tribunal Decision (U/~~FOUC~~) *and (2)(U) Classified Summary of Basis for Tribunal Decision (S/NF)*. Enclosure (2) has been withheld from Petitioners' counsel.

[4] The ARB is a process managed through the Office for the Administrative Review of the Detention of Enemy Combatants at Guantanamo Bay. The process provides an "annual review to determine the need to continue to detain enemy combatants . . . and explain why the enemy combatant's release would otherwise be appropriate." Options available to the ARB include recommending release or continued detention. *See,* ARB implementation rules and procedures (Encl (3)), at http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf.

13.    The record of the CSRT proceeding against Arkina Amahmud (Arkeen Doe) is much

briefer. Arkina Amahmud had a different PR than did his brother, and his PR did not advocate for

him. *See*, Personal Representative Review of the Record of Proceedings, Enclosure (5) of each

return. The PR for Bahtiyar Mahnut is a LtCol, USAF and the PR for Arkina Amahmud is a Major,

USAF. Each handwritten date is in a distinctly different hand.

14.    Arkina Amahmud's written testimony in answer to written questions promulgated by

the Tribunal, was that he left China in August 2001 looking for his brothers, and arrived in

Afghanistan in September 2001. He testified that he had no knowledge of whether an individual that

he traveled with was, or may have been involved with the ETIM or the East Turkistan Islamic Party

(ETIP).  He stayed at a guesthouse in Afghanistan for approximately six weeks. He was captured at

Mazar-E-Sheriff, Afghanistan. *See,* Summarized Unsworn Detainee Statement, Enclosure 3, 1&2.

15.    There was no unclassified evidence showing that he was a member of a Turkish

Islamic group, or that he knowingly associated with a group member. His only statement to the

Tribunal was, basically, that he wanted a lawyer to present his case to "the US Court system or US

Judges":

> I have no more comments [other than the written responses], that is good enough
> evidence, which my Personal Representative already presented. What I wanted to do
> was go to Afghanistan to look for my brothers. I wanted the US Court system or US
> Judges to determine my case, they have to come up with, if I am innocent or not. If I
> am guilty they should come up with my punishment or what ever I deserve to serve
> time, I will do that . Other wise do something faster to finish my case. I would like
> the results as soon as possible.

*Id* at 2.

16.    The CSRT Cover Sheet for Arkina Amahmud notes that "A detailed account of the

evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2)."

Enclosure (2) is classified, and was not produced to counsel. The Unclassified Summary of Basis for

Tribunal Decision, Section 5 (Discussion of Unclassified Evidence) states: "The Tribunal also relied on certain classified evidence in reaching its decision."

**ARGUMENT**

Based on the foregoing statement of facts, it is clear that at least one of the Petitioners is similarly-situated to the dozen or more other Uighur detainees who have been adjudged non-enemy combatants, or otherwise deemed eligible for release because they do not pose a threat to U.S. security. The returns also show that at least one of these Petitioners – and likely both – would have been classified as non-enemy combatants, but for the fact that at the time the Tribunal believed that such a classification would result in automatic rendition to China. Moreover, the enemy combatant determination was made over the vigorous objections of the PR protesting the exclusion of important, readily-available testimony.  All of which raises a red flag that the woefully-minimal process afforded by the CSRTs was compromised even further in these cases.

The Government has not demonstrated a sufficient basis for holding these Petitioners and has withheld material information from Petitioners' counsel, and possibly from the Court. The Assistant Legal Advisor's statement that the Tribunal ***"urges favorable consideration for release of the Detainee,"*** and ***"urges that he not be forcibly returned to the People's Republic of China"*** (emphasis added) alludes to findings, not produced, that are critical to determining whether either Petitioner – or both – are eligible for immediate release. Counsel needs access to the classified CSRT material – and findings by any ARB proceedings – to properly develop these cases and prepare for consultation with the clients.

As an officer of the court for nearly 20 years, all in good standing and without a blemish on that record, counsel must, now, be accorded access to the classified materials in this action filed under seal, and records of any ARB proceedings that occurred. Counsel has submitted all necessary

Case 1:05-cv-01704-UNA     Document 12-2     Filed 09/29/2005     Page 10 of 10

information needed for clearance, and has no reason to believe that clearance will be denied. In separate pleadings counsel will be moving for entry of the Amended Protective Order previously entered by Judge Joyce Hens Green in *Abdah v. Bush,* 04-CV-1254 and the other coordinated Guantanamo Bay detainee cases, and agrees to be bound by its terms.

Because these Petitioners have been imprisoned for nearly four years without cause, Counsel is also asking the Court to order the government to approve counsel's travel to Guantanamo Bay by November 15, 2005 to meet with Petitioners.

For all of these reasons, the Petitioners respectfully request that their Motion for Order be granted.

Dated: September 29, 2005                      COUNSEL FOR PETITIONERS:


Of Counsel:

| | |
|---|---|
| Barbara Olshansky | _____/s/_____ |
| Deputy Director | Elizabeth P. Gilson |
| CENTER FOR CONSTITUTIONAL | CT 002480 |
| RIGHTS | 383 Orange Street |
| 666 Broadway, 7th Floor | New Haven, CT 06511 |
| New York, NY 10012 | Telephone:    (203) 777-4050 |
| Telephone:    (212) 614-6439 | Facsimile:    (203) 787-3259 |